IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| TRACEY A. SCHMIDT, as next friend of D.D.S., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 08-0726-CV-W-FJG |
| METROPOLITAN LIFE INSURANCE COMPANY and GENERAL MOTORS LIFE AND DISABILITY PLAN #503, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 12).

**I. Facts.**

Plaintiff Tracey Schmidt, as next friend of D.D.S., a minor, claims Extra Accident Insurance benefits and Personal Accident Insurance benefits under the General Motors Life and Disability Benefits Program[1] (the "Plan"), in which the decedent, David Schmidt (the "Decedent"), was a participant. The Administrative Record, including applicable Plan Documents, was filed with the Court on January 6, 2009, pursuant to a Joint Stipulation. Portions of the Administrative Record are referenced hereafter as "ML___."

Decedent was found dead on August 22, 2004. Decedent was a participant in the Plan. The Plan is funded by group policies of insurance issued by Metropolitan Life Insurance Company ("MetLife") to General Motors Corporation. MetLife is the claims administrator for the Plan.

---

[1]Defendants assert the Plan was incorrectly named in plaintiff's complaint as General Motors Life and Disability Plan #503.

Tracey Schmidt, Decedent's surviving spouse, submitted a claim for benefits on behalf of their child, D.D.S., the named beneficiary of Decedent's Basic Life Insurance and Optional Life Insurance benefits. Basic Life Insurance and Optional Life Insurance benefits were paid to an account for the benefit of D.D.S. on November 18, 2004.

By letter dated April 15, 2005, an attorney for Tracey Schmidt and D.D.S. notified MetLife that they claimed entitlement to accidental death benefits, by reason of Decedent's death. Copies of Decedent's death certificate, an autopsy report, and a police report were submitted with the letter. The police report reflects that on August 21, 2004, at about 10:38 a.m., police officers responded to Plaintiffs' address "in reference to a suicidal male subject that had been missing since 08-20-04." ML0188. Tracey Schmidt informed the police that Decedent had been missing since about 9:45 p.m. on August 20, 2004. She reported that she and Decedent had separated but were attempting to get back together and salvage their marriage. They and some friends had gone out on August 20, 2004 for alcoholic beverages. The police report states in part:

> After arriving home, they began arguing about their relationship. Tracey's sister, Robin Webb, witnessed the argument and attempted to intervene. The three began arguing with each other, when David grabbed prescribed medication from Robin's purse and ran into the upstairs bathroom. David locked the door and turned on the water faucet. He emerged from the bathroom approximately 30 minutes later. The three began arguing again and David attempted to retrieve a handgun from an upstairs hallway closet. The two attempted to stop him but were assaulted in the process. He did not gain access to the gun. David then told Tracey he was going to kill himself and he was "going out, no matter what." He left the residence on foot in an unknown direction. Robin checked the bathroom after David's departure and observed vomit in the sink and toilet.

ML0188.

The police report also reflects that Tracey Schmidt reported that Decedent had seemed "depressed and distant from her" that day and that "he did attempt to commit suicide once before when he was approximately 18 years old" by taking "an overdose of

2

unknown type of substance." ML0189. The police report further states:

> I then contacted Robin Webb who was at the residence and her statements concurred with Tracey's. She also advised that the following medications prescribed to her and Tracey were possibly ingested by David:
>
> –Methadone, 10 Caplets left in a bottle of 60.
> –Tamae, bottle empty, amount unknown.
> –Diazepam, bottle empty, amount unknown
>
> Robin was unsure if David took any prescription bottles with him when he departed.

ML0189.

On August 22, 2004, after a police search that included use of a helicopter, Decedent was found dead in a field that was surrounded by barbed wire fences. A pill bottle, with a label showing that it was prescribed to Tracey Schmidt, and approximately 11 pills were found on the ground nearby. The police found no signs of foul play either at Tracey Schmidt's residence or in the field. After Decedent's body was located, the police chief recovered six pill bottles from Tracey Schmidt's residence. The pill bottles were empty or nearly so. The police report describes the medications, the persons to whom they were prescribed, and the police department's findings, as follows:

| Tracey Schmidt | Robin Webb |
| --- | --- |
| –Hydroc/APA, 50 tablets | –Methadose, 60 tablets |
| –Diazepam, 120 tablets | –Temazepam, 30 tablets |
| –Temazepam, 30 tablets | –Diazepam, 60 tablets |

> It should be noted that the Methadose prescribed to Robin had approximately 6-8 pills left in it. The other remaining pill bottles were believed to have been full before David was believed to have ingested them.

ML0192.

An autopsy was conducted on August 23, 2004 by Jackson County Deputy Medical

3

Examiner, Thomas H. Gill, M.D. Dr. Gill concluded that the cause of death was "combined drug toxicity" and that the manner of death was "accident." The toxicology report noted the following:

> Autopsy Drug Panel-Femoral Blood:
> Benzodiazepines, Diazepam and Methadone.
>
> Heart Blood Methadone Quantiation:
> Methadone-476 ng/ml
>
> Diazepam and its Metabolites:
> Nordizepam and Oxazepam
>
> Diazepam-262 ng.ml
> Temazepam-95 ng-ml.

ML0186.

Decedent's death certificate shows the cause of death as "Combined Drug Toxicity" and the manner of death as "Accident." In the portion of the death certificate headed "Describe How Injury Occurred," the words "Ingested Drugs" appear.[2]

---

[2] Plaintiff also introduces statements made by co-workers of Mr. Schmidt to the police, in an attempt to present evidence that Mr. Schmidt's death was an accident. For instance, Michael Romeo, a co-worker of David Schmidt, talked with Mr. Schmidt at about 10:00 a.m. on August 20, 2004, the day Mr. Schmidt went missing. Mr. Schmidt told Mr. Romeo that he was not going to be at work that day as he was moving items from an apartment back to his home. ML0193. Defendants indicate that these statements are immaterial, as they preceded decedent's later statements that he was going to kill himself and was "going out, no matter what." ML00188. Mr. Romeo further told police that Mr. Schmidt had not been upset lately, although he had been having problems with his wife. Both Mr. Romeo and Michael Wilson, another co-worker of Mr. Schmidt, told police they could not believe Mr. Schmidt would take his own life, which defendant admits but states are simply the speculative opinions of two co-workers who did not witness decedent quarrel with his wife, consume prescription medications, or state that he was going to kill himself. See ML0193 and ML0188, respectively. Both Mr. Romeo and Mr. Wilson told police that Mr. Schmidt had long term plans in regard to property he wanted to purchase, which defendant admits but states is immaterial. ML0193.

At the time of his death, Decedent was enrolled under the Plan for $34,500 in Extra Accident Insurance and $100,000 in Personal Accident Insurance. The Summary Plan Description for the Plan (ML0001 - ML0116) provides in pertinent part with respect to Extra Accident Insurance:

> An additional benefit, called extra accident insurance, may be payable to your beneficiary for death, or to you for loss of certain bodily members, or loss of eyesight as the result of an accident. For extra accident insurance to be payable, (1) the loss must occur within two years of the accident, or (2) your death must occur within one year following the accident. Your loss or death must not in any way result from or be caused or contributed to, wholly or partly, directly or indirectly, by: (1) disease or bodily or mental infirmity or by medical or surgical treatment or a diagnosis thereof; (2) any infection, except infection caused by an external visible wound accidentally sustained, (3) hernia, no matter how or when sustained, (4) war or any act of war or (5) intentional self-destruction or intentionally self inflicted injury, while sane or insane.

ML0067.

The Summary Plan Description for the Plan states in pertinent part with respect to Personal Accident Insurance:

> **Benefits Are Payable...**
>
> to your beneficiary if you should die as a result of an accident. However, benefits are only payable if you, your spouse/same-sex domestic partner or dependent child sustains an accidental loss within one year of the accident. The loss must not in any way result from or be caused or contributed to, wholly or partly, directly or indirectly, by:
>
> (1) suicide or self-destruction or any attempt thereat, whether sane or insane,
>
> * * * * *
>
> (7) the insured person's act of aggression, participation in a felonious enterprise or illegal use of drugs.

ML0078.

By beneficiary designation dated May 4, 2004, Decedent designated his child,

D.D.S., as the beneficiary of his Basic Life Insurance benefits, and as a result D.D.S. is the beneficiary of any Extra Accident Insurance benefits claimed to be payable by reason of Decedent's death. By beneficiary designation dated June 12, 2003, Decedent designated Tracey A. Schmidt as beneficiary of his Personal Accident Insurance.

By letter dated May 16, 2005, MetLife denied Plaintiff's claim for Extra Accident Insurance and Personal Accident Insurance. MetLife stated in part:

> As you know, David Schmidt was enrolled for Basic Group Life coverage as participant in the General Motors Hourly Plan. On page 15 of the Supplemental Agreement between General Motors Corporation and the UAW dated September 18, 2003, it states, "Extra Accident Insurance is provided while the employee is insured for Basic Life Insurance during active service and while Basic Life Insurance is continued during layoff or leave of absence...."
>
> On page 16 and 17 of the same agreement, "Such benefits are paid provided the death or loss is not caused wholly or partly, directly or indirectly by, (5) intentional self-destruction or intentionally self-inflicted injury, while sane or insane.
>
> The certified death certificate indicated the immediate cause of death as, Combined Drug Toxicity. The Autopsy Report indicated Benzodiazepines, Diazepam and Methadone, found in the blood.
>
> The Police Report indicated that after a dispute with David's spouse Tracey Schmidt, he grabbed prescribed medication that was prescribed to Tracey's sister, Robin. The report also stated that the prescribed medications that were taken were Methadone, Tamae and Diazpam [sic]. He went to a secluded area and consumed all the drugs.
>
> Personal Accident Insurance is a voluntary coverage that is paid for by the insured. Page 65 of the above agreement states under Exclusions, "In no case shall payment be made for any loss which is contributed to or caused, wholly or partly, directly or indirectly, by: (1) suicide or self-destruction or any attempt thereat, whether sane or insane;"[3]

---

[3]Plaintiff notes that this was the only exclusion identified by defendant in the initial denial as to the Personal Accident coverage. See Doc. No. 20, ¶ 7. In its initial denial of Plaintiff's claim under the Personal Accident coverage, Defendant did not identify or

6

> Because Mr. Schmidt's death was caused by his ingestion of Methadone, Tamae and Diazpam [sic] that were not prescribed to him, his death was not accidental as contemplated by the General Motors Life and Disability Benefits Program. Therefore, we must deny your client's claim for Extra Accident and Personal Accident Benefits based on the above exclusions.

ML0173-ML0174. The letter advised Plaintiff of her right to appeal the decision.

Plaintiff appealed MetLife's determination through the local union benefit representative. By letter dated October 5, 2006, MetLife upheld its denial and advised Plaintiff of her further appeal rights.

Plaintiff pursued additional steps in the voluntary appeals process through the International Union. By memorandum dated October 16, 2007, MetLife upheld its determination, stating in part:

> Article II, 3(b) of the Supplemental Agreement dated September 18, 2003 states that Extra Accident benefits "are paid provided the death or loss is not caused wholly or partly, directly or indirectly by . . . (5) intentional self-destruction or intentionally self-inflicted injury, while sane or insane." Article II, 11(d) of the Supplemental Agreement states that benefits are payable for Personal Accident Insurance if, while insured, the employee sustains accidental bodily injuries which result in death within 365 days of the accident. However, the Exclusion Provisions in Article II, 11(f) state that "in no case shall payment be made for any loss which is contributed to or caused, wholly or partly, directly or indirectly, by:. . . (1) suicide or self-destruction or any attempt thereat, whether sane or insane" or "(7) the insured person's . . . illegal use of drugs."
>
> Mr. Schmidt's death certificate states that the cause of death was combined drug toxicity. The police investigation concluded that there was no evidence of foul play either at the Schmidt residence or in the field where Mr. Schmidt

---

cite Exclusion 7, related to illegal use of drugs. See Doc. No. 20, ¶ 8, citing ML0173-74. Defendant admits this, but states that it is immaterial, noting that it cited Exclusion 7, relating to illegal use of drugs, in its memorandum dated October 16, 2007, upholding its determination, and it advised plaintiff of the right to seek further review, if plaintiff chose to do so. ML0134. No appeal was filed and no additional information was submitted to MetLife for review. ML0131-ML0197.

7

was found. Therefore it appears that David Schmidt voluntarily ingested a combination of medications prescribed for someone other than himself resulting in his death.

It is noted that Mr. Schmidt's death certificate lists the primary cause of death as accidental due to combined drug toxicity. However, this determination does not take into consideration the provisions of the General Motors Life and Disability Benefits Program. In view of all of the above information, Mr. Schmidt's death was not an accident as contemplated by the Plan and the exclusions of the Plan, as noted above, prohibit the payment of Extra Accident and Personal Accident Insurance Benefits. Therefore, we must uphold the denial of benefits to [D.D.S.].

If the Union disagrees with MetLife's denial of Plan benefits and wishes to pursue this appeal, they should proceed with step 5 of the six-step Procedure for Review of Denied Claims. MetLife would be happy to review any additional information the Union may wish to submit.

ML0133-ML0134. No appeal was filed and no additional information was submitted to MetLife for review.

## II. Summary Judgment Standard.

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether

8

Case 4:08-cv-00726-FJG   Document 24   Filed 09/14/09   Page 8 of 16

the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

### III.  ERISA Standard of Review.

A court reviewing an ERISA plan administrator's decision denying benefits should apply a de novo standard of review unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If a plan gives the administrator discretionary authority, then a court should review a plan administrator's decision only for abuse of discretion. Id. at 115; Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 571 (8th Cir. 1992), aff'd after remand, 13 F.3d 272 (8th Cir. 1993). The Plan at issue in this case does not contain discretionary language, and therefore the Court will conduct a de novo review. On de novo review,

> a federal court may apply other aspects of the federal common law developed under ERISA to construe disputed terms in a plan, e.g., Brewer v. Lincoln National Life Insurance Co., 921 F.2d 150, 153-54 (8th Cir.1990), and, if there is good cause to do so, the court may allow parties to introduce evidence beyond the materials presented to the administrator.

King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 998 (8th Cir. 2005) (citing Donatelli

9

v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir.1993); Weber v. St. Louis Univ., 6 F.3d 558, 560-61 (8th Cir.1993)).  In this matter, neither party has attempted to provide good cause for the introduction of evidence beyond the administrative record, and the Court will therefore only consider the evidence that was presented to the claims administrator.  See also Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198, 1200 (8th Cir. 1998) (additional evidence is discouraged on de novo review "to ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators").

**IV. Discussion.**

Defendants assert that summary judgment is proper in this matter as the administrative record demonstrates that: (1) as to Extra Accident benefits, decedent's death was caused or contributed to by intentionally self-inflicted injury; and (2) as to Personal Accident Insurance benefits, decedent's death resulted from or was caused or contributed to by decedent's illegal use of drugs.

As an initial matter, defendants assert as to both claims that the medical examiner's listing of manner of death as "accident" is not determinative as it did not take into account the terms of the Plan, including its exclusions.  See Mullaney v. Aetna U.S. Healthcare, 103 F.Supp.2d 486, 491 (D. R.I. 2000); Klei v. Metropolitan Life Insurance Co., 1992 WL 695749, n. 10 (E.D. Mich. Oct. 30, 1992); Ablow v. Canada Life Assurance Co., 2003 WL 23325805 at *6 (D. Conn. Nov. 19, 2003).  Plaintiff argues that these cases are distinguishable, as in Mullaney and Klei, the medical examiner only had four options to choose from, whereas in the current matter the medical examiner could have selected "pending investigation" if he was unsure as to the manner of death.  The Court finds, however, that this distinction does not make a difference.  The precedent cited by defendant is clear that the medical examiner's determination as to whether the death was an accident is not determinative because it does not take into account the language in the

10

ERISA-governed plans at issue. The same is true here. Thus, the Court will not presume that the decedent's manner of death was an accident just because of the finding on the medical examiner's report.

### A. Extra Accident Benefits.

Defendants assert that decedent's death was caused or contributed to by an intentionally self-inflicted injury due to his voluntary ingestion of prescription medications. Defendants note that federal courts in ERISA proceedings have held that the phrase "intentionally self-inflicted injury" is unambiguous. See Fee v. Sheet Metal Workers Local 263, 2000 WL 34027918 (N.D. Iowa, July 28, 2000), aff'd 6 Fed. Appx. 560 (8th Cir. 2001)(on arbitrary and capricious review); Holsinger v. New England Mutual Life Insurance Co., 765 F.Supp. 1279, 1281-82 (E.D. Mich 1991); Bevans v. Iron Workers' Tri-State Welfare Plan, 971 F.Supp. 357, 360-61 (C.D. Ill. 1997) (on de novo review). In cases involving the ingestion of drugs or other substances, courts use a four-factor test in order to determine whether an exclusion for intentional self-inflicted injury applies: (1) Was the ingestion intentional?; (2) Did the insured know that the ingestion would be likely to cause an injury?; (3) Did the ingestion cause an injury?; and (4) Did the loss result from the injury? See Fee, 2000 WL 34027918 at *4; Holsinger, 765 F.Supp. at 1282; McClain v. Metropolitan Life Insurance Co., 820 F.Supp. 169, 178 (D. N.J. 1993).[4]

---

[4]In the suggestions in opposition, plaintiff attempts to assert a different standard should apply in determining the applicability of self-inflicted injury exclusions, citing Missouri state law. See cases cited in Doc. No. 20, p. 3. Plaintiff, however, applies the wrong body of law. The Court must consider instead the federal common law developed under ERISA to construe disputed terms in a plan. King, 414 F.3d at 998. Here, the Court uses the standard proposed by defendant in order to determine whether an intentional self-inflicted injury occurred, which appears to be the standard used by courts across the United States.

Further, plaintiff attempts to distinguish the present case from Fee, 2000 WL 34027918, arguing that Fee was reviewed under an abuse of discretion standard rather than a de novo standard, and further noting that in Fee there was direct evidence that the injured party had experimented with drugs of the type which injured him and knew they were

With respect to the first question (whether the ingestion was intentional), defendant indicates that the only evidence is that decedent intentionally ingested the drugs. Defendant notes there was no evidence of foul play in the police reports. Instead, the evidence is that Tracey Schmidt and her sister Robin Webb saw decedent grab pill bottles from Robin's purse, run into the bathroom, and then lock the door and turn on the water. Decedent attempted to get a handgun from the closet when he emerged from the bathroom 30 minutes later. When Tracey and Robin denied him access to the gun, decedent said he was going to kill himself and that he was "going out, no matter what." After decedent left the house, Tracey and Robin discovered several pill bottles that were now empty.[5] The Court agrees with defendants that the evidence demonstrates that decedent intentionally ingested the prescription medications.

With respect to the second factor (whether decedent knew that the ingestion would be likely to cause an injury), defendants note that numerous courts have held:

It is not necessary that the person ingesting the drugs know that death could

---

dangerous (and that there is no such evidence in this case). Plaintiff's arguments are not availing, as (1) plaintiff fails to distinguish the present matter from the numerous other decisions noted by defendant where on de novo review, courts have upheld denial of claims for benefits finding that voluntary ingestion of drugs amounts to intentionally self-inflicted injury (see, e.g., Garred v. General America Life Ins. Co., 774 F.Supp. 1190, 1198 (W.D. Ark. 1991); Bevans v. Iron Workers' Tri-State Welfare Plan, 971 F.Supp. 357, 362 (C.D. Ill. 1997); Ablow v. Canada Life Assurance Co., 2003 WL 23325805 (D. Conn. Nov. 19, 2003); Gerdes v. John Hancock Mutual Life Insurance Co., 199 F.Supp. 2d 861, 865-66 (C.D. Ill. 2001); McLain v. Metropolitan Life Insurance Co., 820 F.Supp. 169, 178 (D. N.J. 1993)); and (2) plaintiff does not provide any explanation as to how a reasonable person in decedent's position would not know that taking massive quantities of methadone, diazepam, and temazepam would result in injuries, see Bevans, 951 F.Supp. at 362.

[5]Plaintiff does not appear to contest defendants' arguments as to this factor; instead, plaintiff generally argues only that the evidence of suicide is not undisputed, noting that co-workers had said that decedent had not been upset, had been making long-term plans, and that they did not believe he would take his own life. However, these pieces of evidence do not support a conclusion that decedent did not intentionally ingest the drugs.

12

> result. If the person ingesting the drug has a general cognizance that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss.

Bevans, 971 F.Supp. at 362 (citing Holsinger, 765 F.Supp at 1282); Gerdes v. John Hancock Mutual Life Insurance Co., 199 F.Supp.2d 861, 865 (C.D. Ill. 2001). Furthermore, courts have held that decedent should be deemed to have known the risk of injury if a reasonable person in decedent's position would have known of the risk. Bevans, 951 F.Supp. at 362; Gerdes, 199 F.Supp.2d at 866. Here, the decedent ingested the contents of several bottles of medications that were prescribed to his wife and sister-in-law. He also stated that he was going to kill himself, and he previously had attempted suicide through overdose of an unknown substance. After ingesting a large quantity of drugs, decedent left the residence and went to a field in a secluded area surrounded by a barbed wire fence. Defendants assert that in these circumstances, decedent must have known that the drugs could produce some injury.

Although plaintiff does not appear to directly address this factor (see generally Doc. No. 20), plaintiff indicates that the result sought by defendant's is contrary to the Eighth Circuit's decision in King v. Hartford Life and Accident Ins. Co., 414 F.3d 994, 1004-05 (8th Cir. 2005), where the court held that under an abuse of discretion standard, an intentional injury exclusion should not apply to an individual who became voluntarily intoxicated and then died in a vehicular accident. However, the Court finds King is considerably distinguishable, as there is a difference between driving while intoxicated and taking a massive quantity of Methadone, Diazepam, and Temazepam[6]; as noted by the Eighth Circuit, alcohol intoxication is not itself an intentionally self-inflicted injury, whereas it would be difficult to conclude that decedent's intentional ingestion of large amounts of controlled substances prescribed to others and then fleeing to a secluded area is anything other than an intentionally self-inflicted injury. The Court agrees with defendants that a reasonable

---

[6]It appears that decedent ingested approximately 300 tablets. See p. 3, above.

adult in decedent's situation would have been aware of the risk of injury in taking that quantity of medication. The Court finds that decedent knew that the ingestion of the drugs would be likely to cause injury.

With respect to the third and fourth factors, it is undisputed that the ingestion of the drugs caused injury (combined drug toxicity, as recognized in the medical examiner's report), and that this injury caused decedent's death.

Therefore, the Court finds that decedent's death was caused or contributed to by an intentionally self-inflicted injury, and the Plan's exclusion for intentionally self-inflicted injuries bars recovery of Extra Accident Insurance benefits. Defendants' motion for summary judgment as to Extra Accident Insurance benefits is **GRANTED**.

### B. Personal Accident Insurance Benefits.

Defendants assert that decedents' death was caused by his illegal use of drugs. As discussed above, the Plan provides that, in order for Personal Accident Insurance benefits to be payable, "[t]he loss must not in any way result from or be caused or contributed to, wholly or partly, directly or indirectly, by . . . (7) the insured person's act of aggression, participation in a felonious enterprise or illegal use of drugs." On de novo review, the Court gives language in an ERISA-governed plan its common and ordinary meaning. See Adams v. Continental Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004). "Illegal" means "contrary to law," see Tourdot v. Rockford Health Plans, Inc., 439 F.3d 351, 354 (7th Cir. 2006). Decedent ingested Methadone, Diazepam and Temazepam, all of which are controlled substances[7] and all of which were prescribed to people other than decedent. Possession of a controlled substance is unlawful unless the substance is obtained directly from a practitioner or pursuant to a valid prescription (see 21 U.S.C. § 844(a), R.S.Mo. § 195.202). Decedent

---

[7]Methadone is a Schedule II controlled substance (21 U.S.C. § 812 and R.S.Mo. § 195.017 4.(2)(p)), and Diazepam and Temazepam are both Schedule IV controlled substances (21 C.F.R. § 1308.14(c)(14) and (46); R.S.Mo. § 195.017 8.(2)(n) and § 195.017 8.(2)(tt)).

14

did neither; instead, he took medication prescribed to his wife and sister-in-law, and ingested substantial quantities of that medication. Thus, defendants state that decedent's conduct clearly amounts to an illegal use of drugs, which caused or contributed to his death, and thus summary judgment should be granted in defendants' favor.

Plaintiff does not argue that decedent's use of controlled substances prescribed to others does not amount to the illegal use of drugs; instead, plaintiff asserts that defendants should not be allowed to rely on the "illegal use of drugs" exclusion in the Personal Accident Policy, as it was not relied on in defendants' initial denial, citing King v. Hartford Life and Acc. Ins. Co., 414 F.3d 994, 1002-03 (8th Cir. 2005). However, King is distinguishable on two fronts. First, as noted by defendants, in King, the claims administrator in a motion for summary judgment relied on a definition of "accidental" which it had not used at any time in the administrative process, making it a post hoc rationale formulated during litigation. In the present matter, defendants note that the claims administrator used the illegal drugs exclusion in its uphold letter dated October 6, 2007 (ML0132-ML0134), and then advised plaintiff of the right to further review. As the illegal use of drugs exclusion was presented to plaintiff during the administrative process and prior to the filing of this lawsuit, it should not be considered a post hoc rationale formed during litigation. Second, King was decided under the arbitrary and capricious standard of review, not de novo review as is applicable in the present matter. Although post hoc rationales are to be disregarded in the review of a matter that falls under the arbitrary and capricious standard of review,[8] the Court questions whether the same analysis applies when the Court conducts de novo review. In any event, the Court finds that the "illegal use of drugs" exclusion is applicable here, and is not a post hoc rationale that should be disregarded by this Court.

---

[8]"When reviewing a denial of benefits by an administrator who has discretion under an ERISA-regulated plan, a reviewing court 'must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales.'" King, 414 F.3d at 999 (internal citations omitted).

15

Therefore, the Court finds that the illegal use of drugs caused or contributed to cause decedent's death, and the Plan's exclusion for the illegal use of drugs bars recovery of Personal Accident Insurance benefits. Defendants' motion for summary judgment as to Personal Accident Insurance benefits is **GRANTED.**

**V. Conclusion.**

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 12) is **GRANTED.**

**IT IS SO ORDERED.**

/s/Fernando J. Gaitan, Jr.
Chief United States District Judge

Dated:   09/14/09
Kansas City, Missouri

16